IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHAWN R. ORR,                    :
                                 :
            Plaintiff,           :
                                 :
v.                               :        CIVIL ACTION FILE NO.
                                 :        1:07-CV-2653-TWT-SSC
ORBIS CORPORATION                :
(WISCONSIN) and                  :
MENASHA CORPORATION,             :
                                 :
            Defendants.          :

## FINAL REPORT AND RECOMMENDATION

This matter is before the court on the Motion for Summary Judgment [Doc. 55] filed by Defendants Orbis Corporation (Wisconsin) and Menasha Corporation ("Defendants"). For the reasons that follow, it is **RECOMMENDED** that Defendants' Motion for Summary Judgment [Doc. 55] be **GRANTED** and that the claims of Plaintiff Shawn R. Orr ("Plaintiff") be dismissed.

## I.  Procedural History

Plaintiff, an African-American male, filed a complaint [Doc. 1] alleging that Defendants[1] discriminated against him on the basis of his race in violation of 42 U.S.C. § 1981 (Count I) and retaliated against him in violation of 42 U.S.C. § 1981 (Count II). (Doc. 1, Compl. ¶¶ 38-42). Defendants filed answers on

_____

[1] Plaintiffs' complaint named Orbis Corporation, Orbis Container Services, Inc. and Menasha Corporation as Defendants. (See Doc. 1). On October 22, 2009, the parties filed a stipulation of dismissal with prejudice of all claims against Orbis Container Services, Inc. (See Doc. 52). Accordingly, Orbis Container Services, Inc. is no longer a party to this action.

January 25, 2008 [Docs. 5 & 6], and discovery proceeded.

Defendants have now filed a motion for summary judgment, with supporting memorandum and exhibits, and a statement of undisputed material facts. [Doc. 55].[2] Plaintiff has filed a Response in Opposition to Defendants' Motion for Summary Judgment [Doc. 58], a Statement of Disputed Material Facts of Which Genuine Issues Exist for Trial with exhibits [Doc. 59] and a Response to Defendants' Statement of Undisputed Material Facts [Doc. 60]. Defendants have also filed a Notice of Objections [Doc. 61], a reply in support of their motion for summary judgment [Doc. 62] and Responses to Plaintiff's Statement of Facts [Doc. 63]. Plaintiff did not file a response to Defendants' Notice of Objections.

## II.   Defendants' Notice of Objections [Doc. 61]

### A.   Defendants' Objections to Untimeliness of Plaintiff's Response

Defendants argue that Plaintiff's response to their motion for summary judgment "should be disregarded in its entirety due to its gross untimeliness." (Doc. 61 at 1). Citing Local Rules 7.1F[3] and 56.1.B.2., NDGa., Defendants argue

---

[2]Defendants separately filed four Declarations in support of their motion for summary judgment. [Doc. 54]. The Declarations are not marked with exhibit numbers or letters, although the courtesy copies sent to the court were tabbed with letters (A through D), and the attachments to the Declarations are designated by exhibit numbers. The court will refer to these Declarations by reference to their tabbed exhibit letters.

[3]     Local Rule 7.1, NDGa. provides in relevant part:

B. . . . Any party opposing a motion shall serve the party's response, responsive memorandum, affidavits, and any other responsive material not later than fourteen (14) days after service of the motion, except that in cases of motion for summary judgment the time shall be twenty-one (21) days after the service of the motion. Failure to file a response shall indicate that there is no opposition to the motion.

 . . . .

that the court should exercise its discretion to decline consideration of Plaintiff's belated response "as Plaintiff has not even bothered to provide any explanation," and therefore "each of Defendants' facts must be deemed true," and "Plaintiff's claims should be dismissed in their entirety." (Id. at 2).

Defendants filed and served their motion for summary judgment on November 5, 2009. [Doc. 55]. Plaintiff sought and received an extension of time until December 4, 2009 to file his response to Defendants' motion. (See Docs. 56 & 57). Plaintiff did not file his response until March 29, 2010, however, and in his response, he failed to explain his belated filing or request an out-of-time extension for filing his response so late. (See Doc. 58). Nor has Plaintiff responded to Defendants' objections to explain his failures.

The court has serious concerns about considering Plaintiff's late-filed response, particularly in the absence of any explanation or justification for his inaction. Although Fed. R. Civ. P. 6(b)(2) "authorizes a district court to enlarge the time for a litigant to do a specific act following the expiration of the original deadline, such leave should be given 'upon motion' and where the failure to act was the result of excusable neglect.'" Godoy v. Office of Bar Admissions, No. 1:05-CV-0675, 2006 U.S. Dist. LEXIS 50654, at *4 (N.D. Ga. July 24, 2006) (quoting Fed. R. Civ. P. 6(b)(2)). None of those conditions is met in this case, and therefore, the court would be justified in disregarding Plaintiff's response. See, e.g., Young

_____

F. . . . The court, in its discretion, may decline to consider any motion or brief that fails to conform to the requirements of these rules.

v. City of Palm Bay, 358 F.3d 859, 863-64 (11th Cir. 2004) (finding that district court did not abuse its discretion in refusing to consider untimely filed summary judgment response).

However, even if Plaintiff had not responded at all to Defendants' motion, the court "cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion." United States of America v. One Piece of Real Prop., 363 F.3d 1099, 1101 (11th Cir. 2004) (citing Dunlap v. Transamerica Occidental Life Ins. Co., 858 F.2d 629, 632 (11th Cir. 1988) (per curiam)).

> The district court need not sua sponte review all of the evidentiary materials on file at the time the motion is granted, but must ensure that the motion itself is supported by evidentiary materials.  See id. At the least, the district court must review all of the evidentiary materials submitted in support of the motion for summary judgment.

One Piece of Real Prop., 363 F.3d at 1101-02 (citation omitted).  Given the court's responsibilities in this regard, the court prefers to consider Plaintiff's response for whatever value it may have in assisting the court in determining whether Defendants have shown that there is an absence of a genuine issue of material fact to be tried.

Moreover, the court prefers to resolve cases on the merits, and in light of the fact that Defendants have addressed the merits of Plaintiff's response in their reply, they have not shown that they were unduly prejudiced by Plaintiff's untimely response.  See  Snow v. Bellamy Mfg. & Repair, No. 1:94-CV-957-JTC, 1995 U.S. Dist. LEXIS 22113, at *6 (N.D. Ga. Sept. 26, 1995) (There is "[a] strong

4

federal policy favor[ing] resolution of disputes on the merits as opposed to disposition on technicalities."); see also Godoy, 2006 U.S. Dist. LEXIS 50654, at *6-11 (deciding to consider the defendant's late-filed summary judgment response, even in the absence of excusable neglect for its late filing, because of the importance of deciding the case on the merits rather than relying on a procedural technicality).

Accordingly, although Defendants' objection to Plaintiff's untimely response is well-founded, the objection is **OVERRULED**.

**B.** **Defendants' Objections to Statements Submitted by Plaintiff**

Defendants contend that the court should disregard the unsigned and undated Declarations of David Simmons and Rodney Watson submitted by Plaintiff in response to Defendants' motion for summary judgment (see Attachs. 4 & 5 to Doc. 59) because they are not admissible and cannot be relied on in opposition to the motion for summary judgment. (Doc. 61 at 2-3). Specifically, Defendants argue that these Declarations should be disregarded because they fail to satisfy the requirements of 28 U.S.C. § 1746. (Id. at 3).

The undersigned agrees that the Declarations of David Simmons and Rodney Watson (Attachs. 4 & 5 to Doc. 59) are improper because they are not dated or signed, as required by 28 U.S.C. § 1746. That section provides that an unsworn declaration must be:

> subscribed by [the person making the declaration], as true under penalty of perjury, and dated, in substantially the following form: . . . (2) If executed within the United States . . .: "I declare (or certify,

5

verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).  (Signature)".

28 U.S.C. § 1746.

Because the Simmons and Watson Declarations are not dated or signed, the court will not consider them in addressing Defendants' motion or Plaintiff's response, and therefore Defendants' objections to these Declarations are **SUSTAINED**.  See Kaiser v. Shipman, No. 3:07cv229/LAC/EMT, 2009 U.S. Dist. LEXIS 67596, at *32 (N.D. Fla. Aug. 4, 2009) (noting that, because signed declarations were not dated, "[t]he declarations . . . are procedurally deficient and are not appropriate for summary judgment review" (citing Bonds v. Cox, 20 F.3d 697, 702 (6th Cir. 1994)), adopted by 2009 U.S. Dist. LEXIS 79348 (N.D. Fla. Sept. 2, 2009); Hughes v. Dale County Med. Ctr., No. 1:06-CV595-SRW(WO), 2008 U.S. Dist. LEXIS 31325, at *1-3 (M.D. Ala. Apr. 16, 2008) (noting that 28 U.S.C. § 1746 "expressly requires that to substitute for a sworn declaration or affidavit, an unsworn declaration must be dated," and stating that the court did not consider the affidavit at issue in resolving the defendant's motion for summary judgment because it was undated and unsigned); Bryant v. Orlando Sentinel Communs. Co., No. 6:05-cv-1710-Orl-19UAM, 2007 U.S. Dist. LEXIS 44590, at *14 (M.D. Fla. June 19, 2008) (finding the unsigned declaration did not satisfy the requirements of 28 U.S.C. § 1746, and excluding it from consideration on summary judgment).

### III.  Plaintiff's Objections to Defendants' Discovery Responses

Throughout his response to Defendants' motion for summary judgment, Plaintiff argues that he is not able to present comparator and other evidence because of alleged "discovery abuses" by Defendants.  (See Doc. 58, Pl. Br. at 4, 5, 6, 13, 21-22).  The record reflects, however, that during the discovery period, Plaintiff did not file a motion to compel discovery.  Nor has he asked for relief pursuant to Rule 56(f) or followed the procedures specified in that rule since Defendants filed their motion.[4]  See Harbert Int'l v. James, 157 F.3d 1271, 1280 (11th Cir. 1998) ("A Rule 56(f) motion must be supported by an affidavit which sets forth with particularity the facts the moving party expects to discover and how those facts would create a genuine issue of material fact precluding summary judgment." (citing Fed. R. Civ. P. 56(f) and Walters v. City of Ocean Springs, 626 F.2d 1317, 1321 (5th Cir. Unit A 1980)).  Plaintiff has not shown what evidence he expected Defendants to produce and how it would create a genuine issue of fact on any of his claims. Nor has he explained why he did not "make use of the various discovery mechanisms" available to obtain this material, such as a motion to compel.  See FMT Corp. v. NISSEI ASB Co., No. 1:90-cv-786-GET, 1992 U.S.

---

[4] Fed. R. Civ. P. 56(f) provides:

If a party opposing the motion [for summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1)  deny the motion;

(2)  order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or

(3)  issue any other just order.

Dist. LEXIS 21500, at *3 (N.D. Ga. June 10, 1992) ("To succeed under Rule 56(f), the party must present adequate reasons to justify his failure to produce the required proof." (citing <u>Fla. Power & Light Co. v. Allis Chalmers Corp.</u>, 893 F.2d 1313, 1316 (11th Cir. 1990)).  Plaintiff has made no showing that would justify relief based on any alleged failure by Defendants to produce discovery, and the undersigned does not consider these arguments in analyzing Plaintiff's substantive claims.

## IV.  <u>Facts</u>

### A.    <u>Standards for Determining Facts for Summary Judgment</u>

The "facts," for summary judgment purposes only, are derived from Defendants' Statement of Material Facts as to Which There is No Genuine Issue to Be Tried [Doc. 55] (hereinafter referred to as "Def. SMF"), Plaintiff's Response to Defendants' Statement of Undisputed Material Facts [Doc. 60], Plaintiff's Statement of Disputed Material Facts of Which Genuine Issues Exist for Trial [Doc. 59] (hereinafter referred to as "Pl. SMF"), and Defendants' Responses to Plaintiff's Statement of Dispute Material Facts [Doc. 63], as well as uncontroverted record evidence.

The undersigned notes that Defendants did not respond to several of Plaintiff's statements (<u>see</u> Def. Resp. to Pl. SMF, ¶¶ 7, 11-20, 22, 24-28, 31, 38-42, 48), and therefore, these statements are deemed admitted pursuant to LR 56.1B(2) and (3).

The court is not obligated to "scour the record" to determine whether triable

8

issues of fact exist, <u>Tomasini v. Mt. Sinai Med. Ctr. of Fla.</u>, 315 F. Supp. 2d 1252, 1260 n.11 (S.D. Fla. 2004), but the court has reviewed the evidentiary materials submitted in support of the motion for summary judgment to determine whether they support Defendants' assertions and whether there are genuine issues of material fact to be tried.  The facts are construed in the light most favorable to Plaintiff as the non-movant.  <u>See</u> <u>Frederick v. Sprint/United Mgmt. Co.</u>, 246 F.3d 1305, 1309 (11th Cir. 2001).

**B.**    **<u>The Facts Relevant to the Undersigned's Consideration of Defendants'</u> <u>Motion for Summary Judgment</u>**[5]

Defendant Orbis Corporation is a manufacturer of plastic reusable packaging products (Def. SMF ¶ 1) and is a wholly owned subsidiary of Defendant Menasha Corporation (Doc. 7; Def. SMF ¶ 164).  Defendants use robotic machines to produce plastic containers.  (Def. SMF ¶ 139).  The robots operate within a cage and are controlled by employees who remain outside the cage.  (Def. SMF ¶ 140).  Certain employees are authorized to enter the cage of a machine to repair or service a robot.  (Def. SMF ¶ 141).  Defendants have procedures, including lockout/tagout ("LOTO"), that employees are trained to use before entering the cage so that the robot will not be able to start while someone is in the cage.  (<u>See</u> Def. SMF ¶ 142-45; Pl. Resp. to Def. SMF ¶¶ 142-44; Weiss Dep. at 134-35; Orr Dep. 41-42; <u>see also</u> Exs. 3-6 to Orr Dep.).  If the appropriate procedures are not

---

[5] Certain other facts relevant to the undersigned's consideration of the motion are discussed in the body of this Report.

followed, and a robot starts while an employee is inside the cell, the employee could be fatally injured. (Def. SMF, ¶ 145). As an Orbis employee, Plaintiff received training on LOTO procedures and other safety training. (Def. SMF ¶¶ 146-48).

In August 2002, Plaintiff was hired as an electrician at Orbis's Pleasant Prairie, Wisconsin plant. (Def. SMF ¶ 1). Sometime in 2002, Orbis acquired a plant in Lawrenceville, Georgia, and Plaintiff was assigned to travel to the Lawrenceville plant several times in 2003. (Def. SMF ¶¶ 2, 4). On May 19, 2003, Plaintiff transferred to the Lawrenceville plant to work as a maintenance technician. (Def. SMF ¶¶ 5-6, 13). As a maintenance technician he was responsible for troubleshooting machinery, overhauling and reconditioning machinery, evaluating and assisting in the purchase of new equipment and training other employees. (Def. SMF ¶ 14). Plaintiff reported to Darin Verwiebe[6], the process engineer. (Def. SMF ¶¶ 15-16; Orr Dep. at 26; Verwiebe Decl., Def. Ex. D to Doc. 54, ¶¶ 3-4).

In January 2004, Plaintiff was promoted to the set-up team leader, but he retained his maintenance technician responsibilities, and Verwiebe remained his

_____

[6]Although in his Declaration his name is spelled "Verweibe" (see "Verweibe" Decl., Def. Ex. D to Doc. 54), performance documents, including a memorandum from "Darin Verwiebe" (Ex. 7 to Orr Dep.) and performance evaluations signed by him as "Darin Verwiebe" (Exs. 8 & 9 to Orr Dep.) indicate that his name is spelled "Verwiebe."  Accordingly, the undersigned uses the spelling "Verwiebe" throughout this Report and Recommendation.

manager. (Def. SMF ¶¶ 29-30).[7]  As set-up team leader, Plaintiff was responsible for taking, removing, and installing molds of various plastic products and adjusting the molding press so that the production team could make various end products, and for directing day-to-day job assignments and training of the set-up team members.  (Def. SMF ¶¶ 31-32).  The numbers Plaintiff reported while serving as set-up team leader in 2004 indicated that the mold change times were "stellar" and that the Lawrenceville plant's mold change times went from being far worse than other Orbis plants to being among the best.  (Def. SMF ¶ 47).

However, Weiss and Verwiebe observed and received complaints from members of the maintenance and set-up teams that Plaintiff "was demeaning and condescending" toward his team members, and Plaintiff was "repeatedly counseled about his conduct and coached on how to lead and motivate his team." (Def. SMF ¶¶ 34-35; Weiss Dep. at 59-60; Verwiebe Decl., Def. Ex. D to Doc. 54, ¶ 7).[8]   In a July 2004 mid-year review, Verwiebe wrote, among other things, that Orr needed to "confront issues when they arise" and "keep a positive attitude while working through conflict." (Def. SMF ¶ 38; Ex. 8 to Orr Dep.).  In Plaintiff's 2004 year-end review, Verwiebe told Plaintiff that he needed to "learn how to manage his stress

---

[7] Plaintiff replaced Chad Nighorn, white, who was demoted by Weiss, Huth and Verwiebe because of the way he treated the set-up team, his "people skills" and not "working alongside his team." (Weiss Dep. at 32-22, 39-40, 56; see Def. SMF ¶¶ 20, 26-27; Pl. Resp. to Def. SMF ¶ 20).

[8] Plaintiff denies Def. SMF, ¶¶ 34 and 35 and, citing to his deposition testimony, asserts that he "shows that these alleged nondiscriminatory reasons are pretext and the ultimate factual inquiry for the jury." (Pl. Resp. to Def. SMF, ¶¶ 34, 35).  Plaintiff's contentions concerning Defendants' reasons for the employment actions at issue in this case are discussed *infra*.

. . . [because] he lashed out at people and does not stay objective when under pressure" and that his behavior towards others in the department would "not be accepted moving forward."[9]  (Def. SMF ¶¶ 40-41, 43; Ex. 9 to Orr Dep.).   Plaintiff "acknowledged" these issues and stated that he had "installed [his] plan to ease [his] stress and [his] hours" and "must confront on the spot and not 'save it up' for one big confrontation."  (Def. SMF ¶¶ 42, 44).[10]  According to Plaintiff, the criticism he was receiving for how he handled conflict "had nothing to do with Plaintiff's management abilities, rather his relations with a coworker in a another department."  (Pl. Resp. to Def. SMF ¶¶ 40, 44).  Verwiebe wrote that if Plaintiff

---

[9]Plaintiff objects to the admissibility of the statements in his 2004 year-end review (Ex. 9 to Orr Dep.) as hearsay.  (Pl. Resp. to Def. SMF ¶ 41).  The undersigned finds no valid basis for this objection.  Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  Plaintiff's performance evaluations are not admitted for the truth of the matters asserted therein, i.e., that his performance was in fact deficient.  Rather, Defendants submit his evaluations to evidence the decisionmakers' beliefs concerning Plaintiff's job performance and the communication of those beliefs to Plaintiff.  See, e.g., Brill v. Lante Corp., 119 F.3d 1266, 1271 (7th Cir. 1999) (rejecting the plaintiff's contention that evidence concerning client complaints about her was inadmissible hearsay because it was not offered to show that the plaintiff actually said what the clients reported, but to evidence the decisionmaker's "*honest belief* that she said those things," and noting that the company's performance evaluations corroborated that belief) (emphasis in original)); Assa'Ad-Faltas v. Virginia Dep't of Health, No. 91-3025, 1992 U.S. App. LEXIS 19440, at *11-12 (4th Cir. Aug. 20, 1992) (finding that district court did not err in admitting letters and memoranda concerning the plaintiff's performance because the documents "were introduced into evidence for the limited, non-hearsay purpose of demonstrating" that the decisionmaker "had significant cause, irrespective of any alleged romantic interest, to conclude that [the plaintiff] performed her work poorly, and to recommend that she be discharged."), cert. denied, 507 U.S. 967 (1993); Kaur v. New York Health & Hosps. Corp., 688 F. Supp. 2d 317, 323 (S.D. N.Y. 2010) (finding that "the personnel documents, including the performance reviews, complaints, and the accompanying hand-written notes, are not hearsay because they are not being offered to prove the truth of what they assert," but instead, "are being offered to show the state of mind of Defendant's representatives in making various employment decisions with regard to Plaintiff; the truth of the assertions is irrelevant." (citations omitted)).  Accordingly, Plaintiff's objection is overruled.

[10]In response to Def. SMF, ¶ 44, Plaintiff asserts that these criticisms "had nothing whatsoever to do with the management of his set-up team."  His denials do not, however, create an issue of fact as to whether his managers perceived that they did, as discussed *infra*.

continued his "selfish behavior," he would be "remov[ed] from his current position." (Def. SMF ¶ 45; Ex. 9 to Orr Dep.).

Based on the 2004 mold change times that Plaintiff reported, the Lawrenceville plant was expected to complete each month an average of 40 mold changes, many of which were more difficult than the plant had previously been responsible for, beginning in January 2005. (Def. SMF ¶¶ 47-49). When the plant began having great difficulty meeting deadlines, Weiss investigated the production process and determined that the 2004 mold change times "could not be correct." (Def. SMF ¶¶ 51-53). Weiss confronted Plaintiff, and Plaintiff admitted that he had been counting the removal of a mold as one mold change and the insertion of a new mold as a second mold change; according to Plaintiff, a Menasha employee instructed him to count mold changes in this manner. (Def. SMF ¶¶ 54-57; Pl. Resp. to Def. SMF ¶ 54). Because one mold change is the time it takes to remove one mold and put in a new mold, the method of counting mold changes used by Plaintiff resulted in reported numbers being twice as fast as actual performance. (Def. SMF, ¶¶ 55, 57). Plaintiff admits that if he had calculated removal of a mold and insertion of a mold collectively as one change, the mold change times in 2004 would not have met Orbis' minimum expectations. (Def. SMF ¶ 59; Orr Dep. at 63).

After the miscalculation of mold changes was discovered, Verwiebe and Weiss observed that Plaintiff's communication with his team worsened, he was demeaning toward his team and he "was not spending time on the floor assisting

13

and training his team." (See Def. SMF ¶¶ 63-67; Orr Dep. at 61; Verwiebe Decl.,
Def. Ex. D to Doc. 54, ¶ 8; Weiss Dep. at 60, 63).[11]  Verwiebe also received
complaints from other employees about Plaintiff's "communication issues."
(Verwiebe Decl., Def. Ex. D to Doc. 54, ¶ 8).[12]  Verwiebe discussed his concerns
about the set-up team with Weiss, and Weiss asked Dominic Spinella, Human
Resources ("HR") manager, to speak with members of the set-up team. (Def. SMF
¶¶ 70, 72; Weiss Dep. at 63).  Spinella reported to Weiss that set-up team
members said Plaintiff "was being out of control," and Weiss, Verwiebe and
Spinella decided to demote Plaintiff. (Def. SMF ¶ 73; Weiss Dep. at 63).[13]  The
week before informing Plaintiff of the demotion, Verwiebe drafted a demotion letter
and sent it to Weiss, who reviewed it and made changes to it. (Verwiebe Decl.,
Def. Ex. D to Doc. 54, ¶ 9; Weiss Dep. at 59).

On May 25, 2005,[14] Verwiebe and Spinella met with Plaintiff and informed

---

[11]Plaintiff's denials of their observations (see Pl. Resp. to Def. SMF, ¶¶ 63-67) are discussed
*infra*.

[12]Plaintiff denies this assertion (see Pl. Resp. to Def. SMF, ¶ 68), but his denial does not
create an issue of fact as to whether Verwiebe received complaints from other employees about
Plaintiff.

[13] In response to Def. SMF, ¶ 73, Plaintiff "objects to what Mr. Spinella 'recounted' as
inadmissible hearsay, and therefore denies that portion of the statement." Spinella's report is not
hearsay because it is not offered for the truth of the matter asserted; rather, it is admissible to
show that the decisionmakers received information concerning Plaintiff's performance that they
relied on in deciding to demote him, as discussed *infra*.

[14] There is some confusion about what day of the week Plaintiff was informed that he was
being demoted. Plaintiff and Weiss both testified that he was informed on a Monday. (Orr Dep.
at 46; Weiss Dep. at 57-58). However, the memorandum informing Plaintiff of his demotion is
dated May 25, 2005, which was a Wednesday. (Ex. 7 to Orr Dep.; see also Def. SMF ¶ 101; Pl.
Resp. to Def. SMF ¶ 101). The actual day of the week is not a material fact, however.

him that he was being removed from the set-up team lead position and that his salary would be reduced by $2.00 per hour.  (Def. SMF ¶ 76-77).[15]  Plaintiff was given a memorandum from Verwiebe informing him of his demotion.  (Ex. 7 to Orr Dep).[16]  Plaintiff and Verwiebe each signed the memorandum.  (Id.).

Approximately two weeks after he was demoted, Plaintiff complained in person to Verwiebe that the demotion letter was inaccurate.  (Def. SMF ¶ 80-81).  Verwiebe agreed to review the letter and later did so.  (Def. SMF ¶ 81).  According to Plaintiff, he met with Verwiebe and Spinella to discuss the letter, and he also met with Spinella and Pat Feeney, interim manager.   (Def. SMF ¶¶ 82-83).  Sometime after Walt Berg became plant manager, Plaintiff told Berg about the demotion letter, and he told Berg that he had told Verwiebe, Spinella and Feeney that the letter contained inaccuracies.  (Orr Dep. at 78-79).  A memorandum to Plaintiff dated March 24, 2006 and signed by Berg and HR manager Julie Niedfeldt states:

> The facts around your removal are clear enough to uphold that decision.
>
> The issue is closed.
>
> We expect you to continue to perform to your potential as a maintenance multi-craft technician on C Shift.  Failure to do so may result in disciplinary action and potential termination.

(Ex. 10 to Orr Dep.).

---

[15]  In June 2005, however, the decision was made to reduce Plaintiff's pay by only $1.00 per hour to $24.25.  (Def. SMF ¶ 78).

[16]  Jason Hatch, who is white, replaced Plaintiff as set-up team leader.  (Pl. SMF ¶ 28).

Plaintiff became a "Process Technician" in the fall of 2005.  (Def. SMF ¶ 10).

In late December 2005, Plaintiff submitted a written proposal that he be returned

to the set-up team lead position; he also sought to be considered for the

maintenance manager position.  (Def. SMF ¶¶ 108-09).   Berg consulted Thomas

Bissell, Orbis' vice president of HR, and Berg and Bissell agreed that Plaintiff

should not be promoted at that time.  (Def. SMF ¶¶ 115, 117).

In the spring of 2006, Plaintiff returned to the maintenance technician

position.  (Def. SMF ¶ 11).  In April 2006, Plaintiff filed a Charge of Discrimination

with the U.S. Equal Employment Opportunity Commission (EEOC) alleging that

Orbis discriminated against him on the basis of his race in violation of Title VII of

the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII").

(Ex. 12 to Orr Dep.).  Specifically, he alleged that he was demoted on May 25,

2005, denied promotions in December 2005 and February 2006, and received a

"low annual performance evaluation and wage increase" in March 2006 because

of his race.  (Id.).

In July 2006, Plaintiff sent an E-mail to Tom Bender, the Menasha ethics

counselor, claiming that his wife had been subjected to sex discrimination and

summarizing the allegations contained in his EEOC charge.  (Def. SMF ¶¶ 89-90;

see also Ex. 11 to Orr Dep.).  Bender referred Plaintiff's complaints to Tom Bissell,

vice president of HR for Orbis, because they involved alleged discrimination by

Orbis employees.  (Def. SMF ¶ 91; Bissell Decl., Def. Ex. A to Doc. 54, ¶ 3).  Bissell

investigated Plaintiff's claims as part of his investigation of Plaintiff's EEOC

16

Charge, and he submitted a timely response to the EEOC.  (Def. SMF ¶ 92).

On October 26, 2006, Jason Giordon, a process engineer, informed Michelle Erp, HR manager at the Lawrenceville plant, that Plaintiff had violated the LOTO procedures.  (Erp. Decl., Def. Ex. B to Doc. 54, ¶ 6).  Erp asked Giordon to write a report of what he witnessed; that report is discussed *infra*.  (Id.; see also Ex. 3 to Erp. Decl.).  Erp and Steve Slater, the plant manager, decided to terminate Plaintiff's employment.  (Def. SMF ¶ 153; Erp. Decl., Def. Ex. B to Doc. 54, ¶ 7).  They met with Plaintiff the day of the incident and informed him of the reason he was being terminated.  (Def. SMF ¶¶ 154-55).  Plaintiff did not contest the reason. (Def. SMF ¶ 155).

On January 26, 2007, Plaintiff filed a second Charge of Discrimination with the EEOC, alleging that Defendant Orbis Corporation discriminated against him on the basis of his race and retaliated against him in violation of Title VII.  (Def. SMF ¶ 157; Ex. 34 to Orr Dep.).  In that charge, he alleged that he was terminated on October 26, 2006 because of his race and in retaliation for filing the EEOC charge in April 2006.  (Ex. 34 to Orr Dep.).  On October 22, 2007, Plaintiff filed this lawsuit.  [Doc. 1].

## V. <u>Summary Judgment Standard</u>

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party has an initial burden of informing the court of

17

the basis for the motion and showing that there is no genuine issue of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986).  If the non-moving party will bear the burden of proving the material issue at trial, then in order to defeat summary judgment, he must respond by going beyond the pleadings, and by his own affidavits, or by the discovery on file, identify facts sufficient to establish the existence of a genuine issue for trial.  See id. at 322, 324.  A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).  It is not the court's function at the summary judgment stage to determine credibility or decide the truth of the matter. Id. at 249.  Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Id. at 255.

The Eleventh Circuit has explained summary judgment as follows:

The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a

> complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Young v. General Foods Corp., 840 F.2d 825, 828 (11th Cir. 1988) (quoting Celotex Corp. 477 U.S. at 322-23), cert. denied, 488 U.S. 1004 (1989). Furthermore, "[a] nonmoving party, opposing a motion for summary judgment supported by affidavits[,] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991), cert. denied, 506 U.S. 952 (1992). The evidence "cannot consist of conclusory allegations or legal conclusions." Id. Unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment. See Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 714 (11th Cir. 1984).

## VI. Discussion

### A. Plaintiff's Claims Against Defendant Menasha Corporation

Defendants argue that Menasha Corporation was never Plaintiff's employer, was not involved in the decision to terminate Plaintiff, had no control over employment decisions affecting Plaintiff and had no authority to hire, fire, or discipline Plaintiff, and is therefore not subject to liability under § 1981. (Doc. 55, Def. Br. at 2-4). Plaintiff has not responded to Defendants arguments that Menasha was not his employer. Instead, he simply asserts that, with respect to

19

his retaliation claim, he "complained of discrimination to Defendant Menasha's ethics counselor and received no relief," and he "complained to Menasha's ethics counselor, again, to no avail." (Doc. 58, Pl. Br. at 10, 12).

Because the undersigned finds that Defendants are entitled to summary judgment on Plaintiff's claims, the court will assume, without deciding, that Menasha is Plaintiff's employer, and will address Plaintiff's claims against both Defendants on the merits.

**B.    Plaintiff's § 1981 Race Discrimination Claims (Count I)**

In his complaint and during his deposition, Plaintiff alleged that Defendants discriminated against him on the basis of his race by demoting him from his set-up team leader position in May 2005, by not promoting him to set-up team leader and maintenance supervisor or manager, and by terminating him in October 2006. (See Doc. 1, Compl. ¶¶ 19, 26, 27, 19, 37; Orr Dep. at 137-38, 172-73). Plaintiff also alleged in his complaint and during his deposition that he was subjected to pay discrimination. (See Doc. 1, Compl., ¶ 29; Orr Dep. at 43, 158, 165, 175).

**1.    Analytical Framework for § 1981 Disparate Treatment Claims**

Section 1981 of 42 U.S.C. provides:

(a)    Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the

full and equal benefit of all laws and proceedings for the
security of persons and property as is enjoyed by white
citizens, and shall be subject to like punishment, pains,
penalties, taxes, licenses, and exactions of every kind, and to
no other.

(b)    "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce
contracts" includes the making, performance, modification,
and termination of contracts, and the enjoyment of all benefits,
privileges, terms, and conditions of the contractual
relationship.

(c)    Protection against impairment

The rights protected by this section are protected against
impairment by nongovernmental discrimination and
impairment under color of State law.

(Original formatting removed). Although Plaintiff does not bring his claims
pursuant to Title VII, claims under § 1981 and Title VII "have the same
requirements of proof and use the same analytical framework," Standard v.
A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). Thus, the
undersigned applies the Title VII analytical framework to Plaintiff's § 1981 race
discrimination claim, and relies on both Title VII and § 1981 case law in
evaluating Defendants' motion.

A plaintiff may establish a *prima facie* case of discrimination through
circumstantial evidence[17] under the framework set forth in McDonnell Douglas

---

[17] In his response, Plaintiff states he is not presenting direct evidence of discrimination but
is instead relying on the method of proving a *prima facie* case of discrimination through

Corp. v. Green, 411 U.S. 792 (1973) and Texas Dep't of Cmty. Affairs v. Burdine,

450 U.S. 248 (1981):[18]

> [A] plaintiff establishes a prima facie case of race discrimination under Title VII by showing: (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job.

Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997); see also Jones v.

Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1310-11 (11th Cir.), modified, 151

F.3d 1321 (11th Cir. 1998).

If a plaintiff presents a *prima facie* case through circumstantial evidence,

"the defendant must 'articulate some legitimate, nondiscriminatory reason for the

[adverse employment action].' " Bessemer, 137 F.3d at 1310 (quoting McDonnell

Douglas, 411 U.S. at 802).   If the defendant satisfies this rebuttal burden by

producing evidence of a legitimate rationale for its decision, the plaintiff "may

attempt to show that the proffered reason was merely a pretext for the defendant's

acts." Bessemer, 137 F.3d at 1310 (citing Burdine, 450 U.S. at 253). In Burdine,

the Court explained the next step, once the defendant employer articulates a

legitimate, non-discriminatory reason for the employment decision:

---

circumstantial evidence. (Doc. 58, Pl. Br. at 2-3).

[18] The method of proving unlawful discrimination using the burden-shifting scheme discussed below is frequently referred to as the McDonnell Douglas or McDonnell Douglas/Burdine framework or burden-shifting analysis. See, e.g., Thomas v. Tenneco Packaging Co., 293 F.3d 1306, 1315 (11th Cir. 2002); Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 510 (11th Cir. 2000).

> The plaintiff . . . now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

Burdine, 450 U.S. at 256.  The Supreme Court explained further in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508-09 (1993), that the jury's disbelief of the employer's proffered explanation does not mandate a finding of intentional discrimination but rather *permits* the jury to make that finding.  The Court elaborated:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.  Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination. . . .

Hicks, 509 U.S. at 511 (footnote omitted)(emphasis in original);  accord Hall v. Ala. Ass'n of School Bds., 326 F.3d 1157, 1167 (11th Cir. 2003)("[T]he mere disbelief of the employer's proffered reason does not 'compel' a finding of discrimination.").

## 2.    Pay Discrimination Claim

Defendants argue that Plaintiff "has not shown that any similarly situated employee was treated more favorably with regard to his pay," and therefore, Plaintiff "cannot establish a prima facie case with respect to pay." (Doc. 55, Def. Br. at 18).  In his response to Defendants' motion, Plaintiff does not address any

pay-based claims.  Rather, the only disparate treatment claims Plaintiff discusses are his demotion, promotion and termination claims.  (See Doc. 58, Pl. Br. at 4-9).  Therefore, to the extent that Plaintiff asserted a disparate pay claim in his complaint, it is deemed abandoned.  See Fedorov v. Bd. of Regents, 194 F. Supp. 2d 1378, 1393 (S.D. Ga. 2002) ("Grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." (quoting Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir.)(en banc), cert. denied, 516 U.S. 817 (1995))); Snyder v. Time Warner, Inc., 179 F. Supp.2d 1374, 1385 (N.D. Ga. 2001); Welch v. Delta Air Lines, Inc., 978 F. Supp. 1133, 1140 (N.D. Ga. 1997).  Accordingly, it is **RECOMMENDED** that Defendants' motion for summary judgment on Plaintiff's § 1981 pay discrimination claim be **GRANTED**.

### 3.   **Demotion Claim**

#### a.   ***Prima Facie* Case**

Defendants argue that Plaintiff cannot establish a *prima facie* case of race discrimination with respect to Plaintiff's demotion from set-up team leader because Plaintiff has not shown that similarly situated employees outside of his protected class were treated more favorably than Plaintiff. (See Doc. 55, Def. Br. at 18).  Plaintiff contends that he has offered such evidence.  (See Doc. 58, Pl. Br. at 4-5).  The undersigned is doubtful that Plaintiff has created an issue of fact on whether his alleged comparators were sufficiently similar to Plaintiff, in all relevant respects, for purposes of comparing his treatment with the treatment of

the alleged comparators.  See McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008) ("In order to determine whether other employees were similarly situated to [Plaintiff], we evaluate whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways") (internal quotation marks and citations omitted)).  The court in McCann stressed that, in making this comparison, "the quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Id. (internal quotation marks and citations omitted).

However, a *prima facie* case of discrimination can also be satisfied by evidence that a plaintiff was replaced by a person outside his protected class, a fact that the parties, including Plaintiff, do not address. See Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003) (explaining that in order to "prevail on a claim for discrimination under Title VII based on circumstantial evidence," a plaintiff must show that, among other things, "he was replaced by a person outside his protected class **or** was treated less favorably than a similarly-situated individual outside his protected class." (emphasis added)); see also Williams v. Ala. DOT, 509 F. Supp. 2d 1046, 1055 (M.D. Ala. 2007) (finding that the plaintiff had satisfied his burden of "show[ing] that he was demoted under circumstances which give rise to an inference of unlawful discrimination" where there was "a genuine issue of material fact . . . as to whether Williams was replaced by an

individual outside his protected class . . . .").

In the instant case, Plaintiff has presented evidence, uncontroverted by Defendants, that he was replaced as set-up team leader by a white male. (See Pl. SMF, ¶ 28). Accordingly, the undersigned finds that Plaintiff can establish a *prima facie* case of race discrimination in his demotion and will consider whether Plaintiff has created an issue of fact on whether Defendants' proffered reasons for that decision are pretext for race discrimination.

### b. Defendants' Articulated Legitimate, Non-Discriminatory Reason for Employment Decision

The employer's burden to articulate a legitimate, non-discriminatory reason for its employment decisions is one of production, not persuasion. Standard, 161 F.3d at 1331. This burden is "exceedingly light." Turnes v. Amsouth Bank, N.A., 36 F.3d 1057, 1060-61 (11th Cir. 1994)(citations omitted).

Defendants have presented evidence that Plaintiff was demoted in May 2005 for the reasons stated in Verwiebe's memorandum given to Plaintiff on May 25, 2005, which states in relevant part:

> Effective today I am removing you from the Set-Up Leadership Role and returning you to the Maintenance Department.
>
> We are currently not seeing the result needed by the set up team for this plant to meet our customer needs both internal and external.
>
> Over the past few months, the set up team has been heading down a path of self-destruction. This is apparent for the following reasons: increased turnover, low moral in set up team, and poor results (both changeover time and changeover accuracy). The performance of the set up team is largely a result of your management style in set up and interpersonal skills within the Lawrenceville Plant. Often times you have taken a condescending or sarcastic approach when working through issues with other people in the plant. This approach has been apparent, in varying degrees, since you started working in the Lawrenceville Plant. Your respect and credibility have been negatively affected as a result of this behavior.

(Ex. 7 to Orr Dep).

Verwiebe testified that he observed that Plaintiff had communication

27

problems with other employees, including members of his set-up team, and specifically that Plaintiff "was demeaning and condescending," and that in spite of counseling Plaintiff on these issues, Plaintiff "was becoming increasingly demeaning and harsh in his communication with the team and there was no cohesiveness." (Verwiebe Decl., Def. Ex. D to Doc. 54, ¶¶ 7-8). Verwiebe testified that he received complaints from members of the set-up team and maintenance team "about [Plaintiff's] communication issues," and that it "appeared to [Verwiebe] that the team was headed down a path of destruction and was not poised to successfully meet the demands and pressures caused by [Plaintiff's] misrepresentation of mold change time results." (Id.). After consulting with Human Resources Manager Dominic Spinella, who spoke with members of the set-up team, Spinella, Weiss and Verwiebe decided to demote Plaintiff. (Id. at ¶ 9).

The undersigned finds that Defendants have met their "exceedingly light" burden of articulating a legitimate, non-discriminatory reason for demoting Plaintiff from set-up team leader.

### c.   **Pretext**

Because Defendants have articulated a legitimate, non-discriminatory reason for demoting him, Plaintiff must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision" in order to survive

summary judgment.  Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) (quoting Combs v. Plantation Patterns, Meadowcraft, Inc., 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied, 522 U.S. 1045 (1998)).  At this point in the burden-shifting analysis, Plaintiff "must introduce significantly probative evidence" to show that the reasons articulated by Defendants are merely a pretext for discrimination.  See Brooks v. County Comm'n, 446 F.3d 1160, 1163 (11th Cir. 2006).  The court's role at this juncture is to "evaluate whether [Plaintiff] has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendants'] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs, 106 F.3d at 1538 (citation and internal quotation marks omitted).  To demonstrate pretext, Plaintiff must show both that Defendants' articulated reasons were false, and that the real reason was prohibited discrimination.  See Brooks, 446 F.3d at 1163.  "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman, 229 F. 3d at 1030.

Plaintiff argues that Defendants' reasons are pretextual because they "are little more than subjective and involve his 'people skills' and mistaken calculations of mold changeover time (which was not Plaintiff's fault), the former allegedly

29

being the weightier." (Doc. 58, Pl. Br. at 5-6; <u>see also</u> <u>id.</u> at 15-17).  Plaintiff also "relies on the facts that Defendants' management has exhibited discriminatory animus towards minority employees repeatedly and engaged in a pattern of demoting minorities in favor of less-qualified whites as additional and irrefutable evidence that Defendants discriminated against minorities." (<u>Id.</u> at 6; <u>see also</u> <u>id.</u> at 17-18).

### (i)   Subjectivity of Proffered Reasons

Plaintiff contends that Defendants' purported reliance on his "lack of 'people skills' " in deciding to remove him from the team leader position "is a subjective criterion that cannot be quantified or measured except in the mind of the decision maker(s)," and thus, it "must be viewed with greater scrutiny than strictly followed written criteria." (Doc. 58, Pl. Br. at 15).  Quoting <u>Chapman</u>, 229 F.3d at 1034, Plaintiff asserts that "[t]he Eleventh Circuit has mandated that where subjective reasons are relied upon, the employer must 'articulate a clear and reasonably specific factual basis upon which it based its subjective opinion.' " (<u>Id.</u> at 16-17).

In <u>Chapman</u>, the court rejected the plaintiff's contention that the decisionmakers' "assessment of his interview is not a legally sufficient reason to grant summary judgment for the defendants because of its subjective nature" and determined instead that "[a] subjective reason can constitute a legally sufficient, legitimate, nondiscriminatory reason under the *McDonnell Douglas/Burdine* analysis." <u>Chapman</u>, 229 F.3d at 1033.  The court observed that "subjective

evaluations of a job candidate are often critical to the decisionmaking process, and if anything, are becoming more so in our increasingly service-oriented economy." Id.   The court recognized that "[p]ersonal qualities also factor heavily into employment decisions concerning supervisory or professional positions," and that "[t]raits such as common sense, good judgment, originality, ambition, loyalty, and tact often must be assessed primarily in a subjective fashion. . . . yet they are essential to an individual's success in a supervisory or professional position." Id. at 1033-34 (citations and internal quotations omitted).  The court wrote that "[i]t is inconceivable that Congress intended anti-discrimination statutes to deprive an employer of the ability to rely on important criteria in its employment decisions merely because those criteria are only capable of subjective evaluation . . . .  To phrase it differently, subjective reasons are not the red-headed stepchildren of proffered nondiscriminatory explanations for employment decisions.  Subjective reasons can be just as valid as objective reasons." Id. at 1034.

The court acknowledged, however, that a " 'defendant's explanation of its legitimate reasons must be clear and reasonably specific' so that 'the plaintiff be afforded a full and fair opportunity to demonstrate pretext,' " and explained that if an employer relies on a subjective justification for its decision, it therefore must articulate "a clear and reasonably specific factual basis upon which it based its subjective opinion." Id. (quoting Burdine, 450 U.S. at 258).  Thus, an employer must always provide a "clear and reasonably specific" reason for its decisions, regardless of whether the reason is objective or subjective. See Burdine, 450 U.S.

at 258.

Turning to Defendants' articulated reasons for demoting Plaintiff in this case, the undersigned finds that Defendants have articulated a "clear and reasonably specific" reason for demoting him from set-up team leader, i.e., his managers' belief, based on observation and receipt of complaints from other employees, that Plaintiff communicated with employees in a way that had a negative impact on the team's cohesiveness and ability to meet performance demands, an ability already compromised by Plaintiff's miscalculation of mold change results.  Plaintiff has not pointed to evidence that creates an issue of fact on whether his managers received such complaints, or whether they perceived his communication issues to be a problem, as evidenced by statements in his performance evaluations about these issues.

While Plaintiff may disagree with these perceptions, his denials and his own perceptions of his performance do not demonstrate that Defendants' articulated reasons are pretextual.  The pretext inquiry centers on whether Plaintiff has shown that Weiss, Verwiebe and Spinella did not honestly believe their assessment of Plaintiff's performance, not whether their assessment was fair or correct.  See, e.g., Holder v. Nicholson, 287 F. App'x 784, 791 (11th Cir. 2008) (unpublished decision) ("To find in favor of the employer, a finder of fact 'need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith *believed*

32

plaintiff's performance to be unsatisfactory.'" (quoting <u>Elrod v. Sears, Roebuck & Co.</u>, 939 F.2d 1466, 1470 (11th Cir. 1991) (emphasis in original))), <u>cert denied</u>, 129 S. Ct. 2031 (2009); <u>Calloway v. Henry County Bd. of Educ.</u>, No. 1:08-CV-601-WKW[WO], 2009 U.S. Dist. LEXIS 52565, at *32 (M.D. Ala. June 22, 2009) ("Calloway may believe the Board's decision was unfair, and may or may not be justified in that belief, but he has shown nothing to prove it was *racially* discriminatory. 'It is by now axiomatic that [the courts] cannot second-guess the business decisions of an employer.'" (quoting <u>Rowell v. BellSouth Corp.</u>, 433 F.3d 794, 798 (11th Cir. 2005) (emphasis in original))); <u>Dawson v. Henry County Police Dep't</u>, 238 F. App'x 545, 549 (11th Cir. 2007) (unpublished decision) ("The pretext inquiry focuses on the honesty of the employer's explanation; rasing a question about the correctness of the facts underlying that explanation without impugning the employer's honest belief, fails to create a triable pretext issue." (citing <u>Elrod</u>, 939 F.2d at 1470)); <u>see also</u> <u>Curtis v. TeleTech Customer Care Mgmt., Inc.</u>, 208 F. Supp. 2d 1231, 1245 (N.D. Ala. 2002) ("[P]roving pretext requires more than showing that the employer was wrong in its assessment of the underlying facts or was otherwise lacking in wisdom.").

Thus, even if the court agreed with Plaintiff that his managers' perception of his performance and their decision to demote him based on those perceptions were incorrect, Plaintiff has not created a triable pretext issue.

### (ii)    **Evidence of Discriminatory Animus**

Plaintiff contends that there is evidence of discriminatory intent in his demotion: evidence that Weiss "repeatedly demoted minorities from their supervisory positions in favor of less-qualified whites"; evidence that "six other minority workers are alleging unlawful race discrimination against these self-same Defendants and individuals"; and evidence that Weiss and Verwiebe made statements that demonstrate discriminatory animus. (Doc. 58, Pl. Br. at 6, 9, 17-18).[19]

The undersigned finds that Plaintiff's allegations about racially discriminatory treatment of other employees are insufficient to create an issue of fact on pretext. In the first place, Plaintiff has pointed to nothing but conclusory assertions that black employees were demoted in favor of less qualified white employees. (See Doc. 58, Pl. Br. at 9; Pl. SMF, ¶¶ 1-5, 8). Furthermore, the fact that other employees have sued for race discrimination does not establish that they were in fact discriminated against, or that the decisions at issue in this case were discriminatory. As discussed *supra*, Plaintiff has not created an issue of fact on whether his managers honestly believed Plaintiff's performance to be deficient, particularly in the area of communicating with other employees, or whether they relied on these perceived deficiencies in deciding to demote Plaintiff.

---

[19] To support his argument that he can establish a *prima facie* case, Plaintiff asserts that two white employees who had been "rightfully fired, were reinstated to Plaintiff's team by Mr. Weiss *two days* prior to Plaintiff's demotion." (Doc. 58, Pl. Br. at 5) (emphasis in original). Plaintiff has not shown that the termination and reinstatement of the two white employees constitutes evidence that Plaintiff was demoted because of his race.

The undersigned also finds that the statements Plaintiff cites do not demonstrate that the true reason for his demotion was race discrimination. To the extent that Plaintiff relies on the testimony of Simmons or Watson to make this showing, as discussed *supra*, the court will not consider their Declarations. Plaintiff also contends that Weiss made "statements that minorities should not be allowed to make too much money or get ahead, lest they think they had 'made it.'" (Doc. 58, Pl. Br. at 18). Plaintiff provides no record citation for that assertion. However, in his statement of facts, Plaintiff asserts that Weiss "made derogatory remarks repeatedly about minorities," including the statement, "If you let these guys get into too high positions, they'll think they made it." (Pl. SMF, ¶ 9).[20] That assertion is based on the testimony of Michael Camp, one of Defendants' former employees. Camp testified that "Mr. Weiss, apparently referring to minority employees, said 'we' wanted to keep them in non-management positions," and, to the best of Camp's recollection, "if you let those guys get into too high positions, they'll think they made it"; Camp "took this to mean that minorities would become lazy if they were placed into positions of authority." (Camp Decl., attach. 3 to Doc. 59, ¶ 5). Camp also testified that Weiss stated more than once "You can't trust blacks or Latinos, because in the end, they would eat their kids." (Id.).[21]

---

[20]Plaintiff makes other allegations based on Simmons and Watson's Declarations (see Pl. SMF, ¶ 9; Doc. 58, Pl. Br. at 18), which the court will not consider.

[21]Plaintiff also cites to statements that provide no evidence of discriminatory animus: Verwiebe's alleged question to Plaintiff when he visited Plaintiff's house, whether Plaintiff worked for him or vice versa (Doc. 58, Pl. Br. at 18; see also Pl. SMF, ¶ 10) and Weiss's deposition testimony that Plaintiff's pay "would not be unduly affected" when it was reduced because of "the number of call-ins and overtime that he would work . . . ." (Pl. Br. at 18; Weiss Dep. at 65).

35

The undersigned finds that these alleged comments are insufficient to allow Plaintiff to take his case to a jury on the issue of pretext.  As discussed above, Plaintiff has failed to rebut Defendants' proffered reasons for demoting him, and thus, his purported evidence of discriminatory animus does not create an issue of fact on pretext.  See Crawford v. City of Fairburn, 482 F.3d 1305, 1309 (11th Cir.) ("Crawford erroneously argues that evidence of a discriminatory animus allows a plaintiff to establish pretext without rebutting each of the proffered reasons of the employer.") (citations omitted), cert. denied, 552 U.S. 991 (2007); see also Rojas v. State of Fla., 285 F.3d 1339, 1343 (11th Cir. 2002).

In Rojas, the plaintiff alleged that she was fired from her position because of her sex.  Id. at 1342.  The court found that a comment made by the person who fired the plaintiff that a woman named Lane (not plaintiff) "did not deserve her job . . . because Lane was a woman" was "insufficient to establish a material fact on pretext."  Id. at 1342-43.  The court noted that "the evidence relating to the discriminatory comments" must be " 'read in conjunction with the entire record' and 'considered together with' the other evidence in the case." Id. at 1343 (quoting Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1291-92 (11th Cir. 1998)).  The court distinguished the Ross case: "In Ross, fairly strong additional evidence supported a finding of pretext," but no such evidence existed in Rojas.  Id. at

---

Plaintiff asserts, without explanation, "If this is not a racial double-standard, Plaintiff is mystified as to how else it might be explained."  (Pl. Br. at 18).

1343. The court concluded "[b]ecause [the decisionmaker's] comment was (looking at the admissible evidence before the district court) an isolated comment, unrelated to the decision to fire Rojas, it, alone, is insufficient to establish a material fact on pretext." Id.

Similarly, in this case, Weiss's alleged comments are insufficient evidence of pretext to create a jury issue. Plaintiff has failed to rebut Defendants' proffered reasons for demoting him; there is no "fairly strong additional evidence [that] support[s] a finding of pretext." Rojas, 285 at 1343. See also Scott v. Suncoast Bev. Sales Ltd., 295 F.3d 1223, 1227, 1229-30 (11th Cir. 2002) (comment made by person who became plaintiff's supervisor that "we'll burn his black ass" insufficient to create issue of fact as to pretext regarding plaintiff's termination where there was not "additional persuasive evidence of pretext . . ."); Dorrego v. Public Health Trust, 293 F. Supp. 2d 1274, 1287 (S.D. Fla. 2003)(derogatory comments about Hispanic workers made by decisionmaker not sufficient to create issue of fact as to pretext where there was not additional persuasive evidence of pretext).

Because Plaintiff has failed to create an issue of fact on whether Defendants' articulated legitimate, nondiscriminatory reasons for demoting him were pretextual, it is **RECOMMENDED** that summary judgment be **GRANTED** on Plaintiff's § 1981 discriminatory demotion claim.

### 4.    Failure to Promote Claims

Plaintiff alleges in his complaint that he was not promoted to set-up team leader or to maintenance supervisor/manager positions because of his race.  (See Doc. 1, Compl. at ¶¶ 26, 27).

### a.    Promotion to Maintenance Manager

Plaintiff did not address this position in response to Defendants' motion, and therefore, he appears to have abandoned his claim that he was discriminatorily denied the position.  Accordingly, it is **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED** on Plaintiff's § 1981 race discrimination claim arising from the failure to promote him to maintenance manager.

### b.    Promotion to Set-Up Team Leader

#### (i)    *Prima Facie* Case

A plaintiff may present a *prima facie* case of promotion discrimination by establishing the following elements:

> 1) [ ]he is a member of a protected class . . . ; 2) [ ]he was qualified for the employment position in question; 3) [ ]he applied for the employment position in question and was rejected; and 4) the employment position remained open or was filled by a person outside the protected class to which the plaintiff belongs.

Walker v. Mortham, 158 F.3d 1177, 1179 n.2 (11th Cir. 1998), cert denied, 528 U.S. 809 (1999).

Plaintiff argues that he "met the basic qualifications" for the set-up team

leader position because he had previously performed it, and that Defendants cannot defeat his *prima facie* case "by relying on subjective qualifications." (Doc. 58, Pl. Resp. at 7). Defendants argue in their reply that Plaintiff has not shown that he was deemed qualified to hold a supervisory position, "given his previous performance in the Set-Up Lead role." (Doc. 62, Def. Reply at 9).

Because Plaintiff previously held the position of set-up team leader and he was deemed to have met the technical requirements for that position (see Def. SMF, ¶ 112), the undersigned finds that Plaintiff has at least created an issue of fact as to whether he was qualified for the set-up team leader position. The undersigned will address Defendants' arguments concerning Plaintiff's qualifications in evaluating whether Plaintiff has shown that Defendants' articulated reason for failing to promote Plaintiff to the set-up team leader position is pretextual. See Collier v. Clayton County Cmty. Serv. Bd., 236 F. Supp. 2d 1345, 1371 n.35 (N.D.Ga. 2002) (Defendant's argument that plaintiff was not qualified as a result of problems she had while Associate Director "best addressed as part of defendant's proffer of non-discriminatory reasons for its actions."), aff'd, 82 Fed. App'x 222 (11th Cir. 2003); Long v. First Family Fin'l. Servs., Inc., 677 F. Supp 1226, 1231 (S.D. Ga. 1987) (" 'Qualified,' under any plain meaning of the word, relates to the background and skills necessary to carry out the functions of the position. Whether the employee was *applying* those skills in a satisfactory manner is a separate question.") (emphasis in original)).

Although Plaintiff has not addressed in his brief whether "the employment position remained open or was filled by a person outside the protected class to which the plaintiff belongs," <u>Walker</u>, 158 F.3d at 1179 n.2, the undersigned assumes, without deciding, that he can establish a *prima facie* case of discrimination in the failure to promote him to set-up team leader in January 2006 because he has failed to create an issue of fact on whether Defendants' articulated legitimate, non-discriminatory reason for not promoting him is pretextual.

### (ii)    <u>Legitimate    Non-discriminatory    Reasons    for Employment Decision</u>

Defendants contend that Plaintiff was not promoted to the set-up lead position because he was not deemed qualified to hold a supervisory role, given his previous performance as set-up team leader and demotion from that position. (Doc. 55, Def. Br. at 14-15).  Defendants have presented the testimony of Thomas Bissell, the Vice President of Human Resources for Orbis Corporation, who testified that he discussed Plaintiff's promotion to set-up team leader with Walter Berg, the Plant Manager.  (Bissell Decl., Def. Ex. A to Doc. 54, ¶¶ 3,4).  According to Bissell, Berg (who, along with other managers, evaluated Plaintiff for the promotion) explained to Bissell that Plaintiff had been demoted from the position in May 2005, and that the other managers had "reservations about returning [Plaintiff] to the position."  (<u>Id.</u> at ¶ 4).  Bissell "shared with Berg [his] concerns about returning [Plaintiff] to the same position from which he had been demoted

40

just a few months before when there remained significant reservations about his leadership ability and communication style–the primary reasons [Plaintiff] had been demoted," and Bissell "advised Berg against returning [Plaintiff] to the Set-Up Team Lead position." (Id.).   The undersigned finds that Defendants have met their "exceedingly light" burden of articulating a legitimate,  non-discriminatory reason for not promoting Plaintiff to set-up team leader.

### (iii)   Pretext

In the failure to promote claim, Plaintiff relies on the same evidence and arguments about pretext that he asserts in support of his demotion claim, discussed *supra*.  (See Doc. 58, Pl. Br. at 15-18).   For the reasons already discussed in the analysis of Plaintiff's demotion claim, the undersigned finds that those assertions do not create an issue of fact on pretext.  Moreover, Plaintiff has not shown that Defendants' articulated reasons for not promoting him to the set-up team leader position are pretextual.  He has not pointed to any evidence that the managers who evaluated his application for promotion to the set-up team leader did not rely on the fact that he had been demoted from that position within the prior year, and that they remained concerned about the performance issues that led to his demotion.

Because Plaintiff has failed to create an issue of fact on whether Defendants' articulated legitimate, nondiscriminatory reasons for not promoting him to the set-up team leader position were a pretext for discrimination, it is **RECOMMENDED**

41

that summary judgment be **GRANTED** on Plaintiff's § 1981 race discrimination claim arising from the failure to promote Plaintiff to set-up team leader.

### 5. <u>Discriminatory Termination Claim</u>

#### a. ***Prima Facie* Case**

Defendants argue that Plaintiff cannot establish a *prima facie* case of race discrimination with respect to his termination because he has not shown that a similarly situated employee outside his protected class was treated more favorably than Plaintiff.  (Doc. 55, Def. Br. at 17-18).  Plaintiff argues that he has identified such a person, Mehmed Dropic, a white employee who was terminated for violating the LOTO procedure, but was then rehired.  (Doc. 58, Pl. Br. at 9).[22] Defendants argue that Dropic is not a proper comparator because, unlike Plaintiff, Dropic did not speak or understand English well, "so he was allowed to return to work because he likely did not understand the information communicated during the training," and even Plaintiff agreed that Dropic should be returned to work. (Doc. 55, Def. Br. at 17).  Defendants also assert that Dropic was "terminated and returned to work by a different management team."  (<u>Id.</u>).

The undersigned will assume for purposes of Defendants' motion for summary judgment that Plaintiff can establish a *prima facie* case of discrimination

---

[22]Plaintiff also asserts that Jason Giordon, the person who reported Plaintiff for violating the LOTO policy, "did exactly what it is he accused Plaintiff of having done that led to Plaintiff's termination, and no adverse action was taken against Mr. Giordon."  (Doc. 58, Pl. Br. at 9). Plaintiff cites the Declarations of Watson and Simmons to support this assertion (<u>see</u> Pl. SMF, ¶ 49), but the court will not consider those Declarations.

on his termination claim, and will address the parties' contentions about Mr. Dropic in the legitimate, non-discriminatory reason/pretext analysis.

**b.    Legitimate Non-discriminatory Reasons for Employment Decision**

Defendants articulate that Plaintiff was terminated for violating the LOTO policy.  (Doc. 55, Def. Br. at 19-20).  Michelle Erp, Orbis's Human Resources Manager at the Lawrenceville, Georgia facility, testified that on October 26, 2006, Giordon, a Process Engineer, "informed [her] that [Plaintiff] violated the LOTO procedures, and Giordon wrote a report concerning that violation pursuant to Erp's instructions.  (Erp Decl., Def. Ex. B to Doc. 54, ¶ 3, 6; Ex. 3 to Erp Decl.).  That report states:

> Thursday 10/26/2006 at approximately 5:00 AM in the morning I was coming to the MLAN computer system to check the material settings for the start up on press 2.  As I was walking over there I noticed Shawn Orr walking out of the Assembly Station robot cage (WC 80) through the conveyor.  I watched to see if he had the robot locked out, but he did not, he just reset the fault and pushed cycle start.  The robot took off and it faulted out again.  This time the operator went to walk in to the cage, but Shawn stopped him.
>
> After the incident I approached Shawn Orr and stated that the operator probably wanted to walk right in the cage because of the example that was set by Shawn.  He replied, "We do it all the time." I reminded him that someone got hurt at WC 80 the day before, and that he needs to lock the robot out if he's going in the robot cage.

(Ex. 3 to Erp. Decl.).  According to Erp, the LOTO "policy is an important safety rule at Orbis because a violation could be fatal," and, pursuant to the Orbis Plant Rules of Conduct, violation of that policy is a terminable offense.  (Erp. Decl., Def.

43

Ex. B to Doc. 54, ¶ 5; Ex. 2 to Erp Decl.).  Based on Giordon's report, Erp, along with Plant Manager Steve Slater, decided to terminate Plaintiff, and they "communicated the decision to [Plaintiff] together." (Id. at ¶ 7; Ex. 4 to Erp. Decl.).

The undersigned finds that Defendants have met their "exceedingly light" burden of articulating a legitimate,  non-discriminatory  reason for terminating Plaintiff.

### c.   **Pretext**

In his attempt to demonstrate pretext, Plaintiff has not rebutted evidence that Giordon reported to Erp that Plaintiff had violated the LOTO policy, or pointed to evidence that Erp and Slater did not believe that Plaintiff had violated the policy.    Thus, Plaintiff has failed to address Defendants' articulated reason for terminating him head-on and rebut it.  Chapman, 229 F. 3d at 1030 ("Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.").  Furthermore, even if Giordon's report were untrue, or Erp and Slater's belief that Plaintiff violated the policy was mistaken, such evidence (if it existed) would not demonstrate pretext. In Sweeney v. Ala. Alcoholic Beverage Control Bd., 117 F. Supp. 2d 1266, 1273 (M.D. Ala. 2000), the court explained

> [t]hus, to establish pretext, the employee must show more than facts
> establishing that he or she did not commit the work rule violation.
> The employee must point to evidence which raises a question as to
> whether the decisionmaker, in fact, knew that the violation did not

occur and, despite this knowledge, fired the employee based on the false premise of an alleged work rule violation.  For example, where the employer relies on a subordinate's report that a plaintiff violated a work rule, the plaintiff must establish pretext by showing (or, at least, pointing to evidence that suggests) that the employer either did not rely on that report or that the employer did rely on the report but knew it was false. (citation omitted).

Sweeney, 117 F. Supp. 2d at 1273).

Instead, Plaintiff argues that "he could not always comply with a strict lock out/tag out policy"; he denies that a "strict lock out/tag out policy" had been "published and promulgated at the plant"; and he asserts that "white employees had violated the unwritten and unverifiable policy allegedly in place during the relevant time period and suffered no adverse consequences." (Doc. 58, Pl. Br. at 20).[23] The undersigned finds these arguments to be without merit and insufficient

---

[23]Plaintiff also takes issue with Defendants' submission of a Declaration by Giordon (Def. Ex. C to Doc. 54) and argues that it is inadmissable because Giordon "was never identified in discovery by Defendants," and "Defendants never amended their initial disclosures to provide Plaintiff or the Court a description of his anticipated testimony." (Doc. 58, Pl. Resp. at 20-21).

Defendants respond that "Giordon is no surprise" because Plaintiff produced a copy of Giordon's contemporaneous written statement concerning the violation, Giordon was discussed during Plaintiff's deposition, and Giordon's statement and Michelle Erp's report of what Giordon told her were both produced to Plaintiff on May 6, 2008. (Doc. 62, Def. Reply at 7 & n.8). Defendants also argue that the omission of Giordon's name from their witness lists is harmless and that "even if the Court disregards Giordon's testimony, the fact remains that Erp and Slater were told, by a member of plant management, that [Plaintiff] violated the LOTO policy; they relied on the report in good faith; and [Plaintiff] did not contest the allegations when confronted." (Id. at 7 n.7-8 (internal citations omitted)).

Given that Plaintiff was aware, certainly during the discovery period, of Giordon's involvement as a witness, and the substance of his knowledge of events giving rise to this lawsuit, Plaintiff has not shown any prejudice from Defendants' failure to identify Giordon in its witness list.  Accordingly, the undersigned will not exclude Giordon's declaration.  See Little v. Groome Transp. of Ga., Inc., No. 1:07-CV-0455-JOF, 2008 U.S. Dist. LEXIS 83701, at *13-14 (N.D. Ga. Sept. 15, 2008) (finding that "there could be no unfair surprise in the production of . . . [the] declaration" of a witness who was not listed on any disclosures and noting that the witness's name was in documents produced during discovery).

Moreover, Giordon's Declaration testimony (which is consistent with Erp's account) is immaterial to the court's consideration of Defendants' motion.  The critical inquiry is whether Erp,

to demonstrate pretext.

First, Plaintiff's efforts to call into question the existence of a LOTO policy and his denials that he was aware of such a policy do not demonstrate pretext because he admitted Def. SMF, ¶¶ 146-48, which provide: "In August 2005, Orr took Orbis' LOTO Training and verified his understanding that a violation of the LOTO policy could result in disciplinary action up to and including termination"; "in September 2005, Orr noted his understanding that he needed to adhere to the LOTO policy in his comments to a 60 day review"; and "in December 2005, Orr viewed a safety video reinforcing the Company's LOTO policy and took a test at the conclusion of the video."

Furthermore, by arguing that he could not always follow LOTO procedures when performing maintenance on a machine, it appears that Plaintiff is arguing that Defendants should excuse the violation.  However, even if Plaintiff believes that it was unfair to terminate him for failing to follow a policy that is difficult to follow, pretext is not shown by questioning the wisdom or fairness of the employer's decision.  See Nix v.WLCY Radio/Rahall Commc'ns, 738 F.2d 1181 (11th Cir. 1984), where the court explained:

> Title VII addresses *discrimination*.  Title VII is not a shield against harsh treatment at the workplace.  Nor does the statute require the employer to have good cause for its decisions.  The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for

as a decisionmaker, believed that Plaintiff violated the LOTO policy based on what Giordon told her about the incident, both verbally and in his report submitted at the time of the incident, not what he now states in his Declaration.

a discriminatory reason.  While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination.  The employer's stated legitimate reason . . . does not have to be a reason that the judge or jurors would act on or approve.

Id. at 1187 (internal quotation marks and citations omitted) (emphasis in original).

Finally, Plaintiff's assertion that white employees have violated the LOTO policy but were not terminated fails to show pretext.   The only arguable comparator about whom Plaintiff presented admissible evidence is Mehmed Dropic, a white employee who was terminated for violating the LOTO procedure, but was then rehired.  (Doc. 58, Pl. Br. at 9).  Plaintiff testified that Dropic violated the LOTO policy and was terminated, but was rehired 4 months later.  (Orr Dep. at 173).  Plaintiff does not know why Dropic was reinstated, but he testified that he "didn't think it was fair that [Dropic] was terminated" because Dropic did not understand English "as well as most of us," and Dropic was not provided with an "interpreter teaching him lockout/tagout."  (Id. at 173-74).

Plaintiff has offered no evidence that the decision to rehire Dropic was made by Erp and Slater, the persons who decided to terminate Plaintiff for violating the LOTO policy.  Moreover, Plaintiff's own testimony shows that Dropic and Plaintiff were not similarly situated in that a language barrier interfered with Dropic's understanding of the LOTO training, while there is no such evidence concerning Plaintiff.  Accordingly, Plaintiff has not shown that he and Dropic were similarly situated such that a comparison of their treatment provides evidence that Plaintiff was terminated because of his race.  See Wilson v. B/E/Aero., Inc., 376 F.3d

47

1079, 1090 (11th Cir. 2004) ("The plaintiff and the employee she identifies as a comparator must be similarly situated 'in all relevant respects.' The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." (internal citations omitted)).

Because Plaintiff has not shown that Erp and Slater did not rely on Giordon's report that Plaintiff had violated the LOTO policy, or that they did not believe that he had violated that policy, Plaintiff has failed to demonstrate that Defendants' articulated legitimate, non-discriminatory reason for terminating Plaintiff was a pretext for race discrimination. Accordingly, it is **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED** on Plaintiff's § 1981 discriminatory termination claim.

## C.    **§ 1981 Retaliation (Count II)**

Plaintiff contends that he was terminated in October 2006 in retaliation for engaging in statutorily protected activity, including filing a charge of discrimination with the EEOC in April 2006; leaving "copies of anti-discrimination statutes in management mailboxes"; and "complain[ing] of discrimination to Defendant Menasha's ethics counselor . . . ." (Doc. 58, Pl. Br. at 10).

### 1.    **Analytical Framework**

"Absent direct evidence of discrimination, when analyzing claims for race-based retaliation brought under § 1981, we employ the tripartite analytical framework developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, . . . and subsequently modified in *Texas Dep't of Cmty. Affairs v.*

*Burdine*, 450 U.S. 248 . . . (1981)." <u>Bryant v. Jones</u>, 575 F.3d 1281, 1307 (11th Cir. 2009), <u>cert. denied</u>, 130 S. Ct. 1536 (2010).[24]  "Under this framework, a plaintiff alleging retaliation must first establish a prima facie case by showing that: (1) he engaged in a statutorily  protected activity; (2) he suffered an adverse employment action; and (3) he established a causal link between the protected activity and the adverse action." <u>Id.</u> at 1307-08.

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory basis for the action. <u>Pennington v. City of Huntsville</u>, 261 F.3d 1262, 1266 (11th Cir. 2001). If the defendant does so, then in order to avoid summary judgment, the plaintiff must point to evidence from which reasonable jurors could conclude that the employer's proffered explanations are a pretext for retaliation.  <u>See</u> <u>id.</u>  The ultimate burden of proving pretext remains on the plaintiff.  <u>Id.</u>

### 2.  <u>Plaintiff's Retaliation Claim</u>

It is undisputed that Plaintiff suffered an adverse employment action when he was terminated.[25]  Defendants argue that the only protected activity Plaintiff engaged in was filing an EEOC Charge in April 2006 and his July 2006 complaint

---

[24] Plaintiff has not pointed to direct evidence of retaliation.

[25] In his deposition, Plaintiff alleges that the following acts were retaliatory: "the [demotion] letter was never cleared up"; he was not promoted; he "was given erroneous evaluations"; "nobody would listen" to him; and he was terminated.  (Orr Dep. at 170, 177).  In his response to the motion for summary judgment, however, Plaintiff alleges only termination to establish the adverse employment action element of his *prima facie* case of retaliation.  (<u>See</u> Doc. 58, Pl. Resp. at 10). Accordingly, arguments about the other adverse actions alleged by Plaintiff during his deposition are deemed abandoned.

to Menasha, and that there is no causal connection between either activity and his termination in October 2006 due to the lapse of four to six months between those events. (Doc. 55, Def. Br. at 7-9). Defendants also argue that "any inference of a causal connection between Plaintiff's allegedly protected conduct and his termination is negated by the fact that, in the interim, management was informed that Plaintiff violated the LOTO policy." (Id. at 9).

The undersigned will assume, without deciding, that Plaintiff can establish a *prima facie* case of retaliatory termination[26] because, as discussed *supra*, Plaintiff has failed to create an issue of fact that Defendants' legitimate, non-discriminatory reason for terminating him, i.e., his alleged violation of the LOTO policy as reported by Giordon to Erp, was pretextual.

Accordingly, it is **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED** on Plaintiff's § 1981 retaliatory termination claim.

---

[26]In arguing that there is evidence of a causal connection between his protected activity and his termination, Plaintiff asserts, without citation to record evidence, that "there was management discussion of at least demoting Plaintiff to some unknown and nonexistent position to perform 'special projects,' which, admittedly, by Defendants' own management, was calculated to lead to Plaintiff's termination." (Doc. 58, Pl. Br. at 13). He also asserts, citing Pl. SMF, ¶ 21, that after he complained, "Mr. Berg, then plant manager, warned Plaintiff that Mr. Verwiebe was seeking a reason to terminate Plaintiff's employment." (Doc. 58, Pl. Br. at 12). In Pl. SMF, ¶ 21, Plaintiff alleges that when Operations Manager Walter Berg "initially placed Plaintiff in the 'special projects' position, he indicated affirmatively that it was geared to remove Plaintiff from Mr. Verwiebe's supervision, acknowledging that if Plaintiff were not transferred, a reason for his termination would be engineered. (Orr Depo., pp. 27-28, 78, 81, 86-87)." Plaintiff's cited testimony does not support these assertions, however. At most, they show that Plaintiff's supervisor, Richard Williams, "shared with [Plaintiff] that he had [Plaintiff] in his department because Mr. Verwiebe was probably going to figure out a way to terminate [Plaintiff]." (Orr Dep. at 27, 86). Plaintiff does not "know where" Williams got that information, but he speculated that it was "[p]robably from Mr. Verwiebe." (Id. at 86-87). According to Plaintiff, Berg simply told Plaintiff that Plaintiff's "supervisor" told Berg that Plaintiff "had a bad attitude," but Berg did not tell Plaintiff that "someone would find a way to terminate [Plaintiff]." (Id. at 87-88). The undersigned also finds these assertions to be irrelevant in light of the fact that Erp and Slater made the decision to terminate Plaintiff, and there is no evidence that Verwiebe or Berg was involved in that decision.

## VII.  <u>Conclusion</u>

**IT IS RECOMMENDED** that Defendants' motion for summary judgment [Doc. 55] be **GRANTED** and that all of Plaintiff's claims against Defendants be dismissed.

The clerk is **DIRECTED** to terminate referral of this matter to the undersigned magistrate judge.

**IT IS SO REPORTED AND RECOMMENDED** this 30th day of July, 2010.


*Susan S. Cole*

Susan S. Cole
United States Magistrate Judge